**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OPTERNATIVE, INC.,

      Plaintiff,

v.

JAND, INC., D/B/A WARBY PARKER,

      Defendant.

Case No. _____

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff, Opternative, Inc. ("Opternative"), hereby asserts claims of breach of contract, misappropriation of trade secrets, unfair competition, specific performance, and in the alternative unjust enrichment against JAND, Inc. d/b/a Warby Parker ("Warby Parker"), and alleges as follows:

## PARTIES

1.      Opternative is a corporation organized and existing under the laws of Delaware, with its principal place of business at 1 N State Street, Chicago, Illinois 60602.

2.      Warby Parker is a corporation organized and existing under the laws of Delaware, with its principal place of business at 161 Avenue of the Americas, New York, New York 10013.

## JURISDICTION AND VENUE

3.      There is an actual and justiciable controversy between the parties under 18 U.S.C. § 1836 and 35 U.S.C. § 256.  The Court, therefore, has subject matter jurisdiction over the misappropriation of trade secrets and patent inventorship claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b).

4.      This Court further has supplemental jurisdiction pursuant to 18 U.S.C. § 1367 over all state and common law claims arising in this action, including Opternative's claims for breach of contract and misappropriation of trade secrets under New York Common Law, because those state and common law claims are so related to the claims over which this Court has original jurisdiction that the state and common law claims constitute part of the same case or controversy under Article III of the United States Constitution.

5.      Furthermore, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

6.      This Court has personal jurisdiction over Warby Parker because Warby Parker resides in and has its corporate headquarters in this judicial district.   Warby Parker has also regularly conducted business in this judicial district, and committed the acts alleged in this Complaint in this judicial district.   Furthermore, in the non-disclosure agreements forming the basis for Opternative's breach of contract claims, attached hereto as Exhibits A–C (collectively, "the Non-Disclosure Agreements"), Warby Parker consented to jurisdiction in the courts of New York City for claims arising thereunder. Ex. A, ¶ 7; Ex. B, ¶ 11; Ex. C, ¶ 11.

7.      Venue is proper in this District pursuant to 18 U.S.C. § 1391(c) because Warby Parker is subject to personal jurisdiction in this District, and further because, in the non-disclosure agreements forming the basis for Opternative's breach of contract claims, Warby Parker consented to venue in the courts of New York City for claims arising thereunder. Ex. A, ¶ 7; Ex. B, ¶ 11; Ex. C, ¶ 11.

## BACKGROUND

8.      Opternative is a Chicago-based healthcare technology startup focused on developing innovative technology and business solutions for the provision of accurate, convenient, and affordable corrective lens prescriptions based on online eye exams (also known as "refractions").

9.      Opternative was founded on the vision of instigating progress in the eye exam and corrective lens prescription business sector, an industry that had not substantially revised how it conducted refractions in over sixty years, by making the process of taking an eye exam cheaper, easier, and more convenient for the patient.  To that end, Opternative developed a first-of-its-kind system whereby ophthalmologists generate an accurate corrective lens prescription using Opternative's innovative refraction technology: an online eye-exam a patient can self-administer from any location without the use of specialized equipment.  In the process, Opternative created the market for online refractions.

10.      Opternative invested substantial effort and resources to develop its first-of-its-kind technology and to map the complex, interconnected web of laws, regulations, and ethical obligations it would be subject to in executing its mission to provide remote vision testing and corrective lens prescription services, and developed innovative methods, protocols, and corporate structures to ensure compliance therewith.

11.      Opternative launched its online refraction service to the public in July of 2015, following an extensive beta period spanning over one year and 1,500 users wherein Opternative refined its application and user experience, conducted comprehensive clinical trials, and tuned the proprietary and trade secret algorithm forming the foundation of its technology.  Despite highly favorable clinical trial results and positive user feedback, Opternative weathered fierce resistance

3

from optometric associations, optometric regulatory entities, and optometrists in paving the way for corrective lens prescriptions based on online refractions.

12.     Through its commitment to innovation and leadership in terms of both the technology and business aspects of the eye exam industry, Opternative has garnered critical acclaim and developed a strong reputation for its service offerings and technology.  However, Opternative is still a startup in a critical phase of its growth as a company where it must convert its substantial investments in technological and business methods innovation into commercial success.

13.     At this stage of its development, Opternative can ill afford to have an interloper, who has not incurred the substantial investment expenditures Opternative assumed as the first mover, misappropriate and use technical, business, and competitive knowledge provided in confidence by Opternative and then enter the market as a competitor to Opternative.  Indeed, this is precisely the type of problem the trade secret laws were created to correct.

14.     Yet, this is precisely what Warby Parker has done by soliciting the disclosure of confidential and trade secret information from Opternative under false pretenses, then using that information to assess the viability of the market and enter the business to Opternative's detriment, including using Opternative's disclosed confidential information and trade secrets to accelerate the development of its own competing online eye exam system.

15.     In 2013, Opternative connected with Warby Parker to discuss Opternative's then in-development online refraction system and the potential for partnership.  Opternative's overtures were met with substantial apparent enthusiasm by Warby Parker.  To enable these discussions, Opternative and Warby Parker entered into the first of three non-disclosure agreements, effective

May 2, 2013 ("the First NDA"), which provided that the recipient of "Proprietary Information"

agreed:

> (a) to use [the Proprietary Information"] **only** for its consideration internally of a potential business relationship or transaction between the parties, and its performance in any resulting arrangement, **but not for any other purpose**, (b) to maintain the Proprietary Information as confidential and exercise reasonable precautions to prevent any unauthorized access, use, or disclosure, (c) not to copy the Proprietary Information, (d) not to disclose the Proprietary Information to any third party other than Recipient's employees and agents who have a need to know **for the permitted purpose** under this Agreement and who are similarly bound (consistent with the restrictions in this Agreement) to protect the Proprietary Information, (e) **not to decompile, disassemble or otherwise reverse engineer any Proprietary Information, or use any similar means to discover its underlying composition, structure, source code or trade secrets** and (f) not to export or re-export (within the meaning of U.S. or other export control laws or regulations) any Proprietary Information or product thereof and in violation of U.S. or other export control laws or regulations.

Ex. A, ¶ 2 (emphases added).  Further, regarding the harm that would be caused by breach of the

First NDA, the agreement provided:

> 6.    **Remedies.**  Due to the unique nature of the Proprietary Information, the parties agree that any breach or threatened breach of this Agreement will cause not only financial harm to Discloser, but also irreparable harm for which money damages will not be an adequate remedy.  Therefore, Discloser shall be entitled, in addition to any other legal or equitable remedies, to an injunction or similar equitable relief against any such breach or threatened breach without the necessity of posting any bond.

Ex. A, ¶ 6.

16.    Under the protection of the First NDA, Opternative provided Warby Parker with

substantial confidential Proprietary Information.

17.    This confidential Proprietary Information included numerous demonstrations of the

latest builds of its in-development online refraction system and an explanation as to how the system

operated to determine corrective lenses prescriptions.

18.     Further, on September 2, 2014, Opternative provided Warby Parker with confidential correspondence between Opternative and the FDA regarding the likely FDA classification of Opternative's online refraction system.

19.     Regarding termination, the agreement provides:

> **Termination.**   This Agreement will terminate as to the further exchange of Proprietary Information immediately upon the earlier of (a) receipt by one part of written notice from the other and (b) the third anniversary of this Agreement.  The confidentiality obligations of this Agreement, as they apply to any Proprietary Information disclosed prior to termination, will survive termination for a period of five (5) years; *provided*, Recipient's obligations hereunder shall survive and continue in effect thereafter with respect to any Proprietary Information that is a trade secret under applicable law.  Upon termination of this Agreement for any reason, or upon Discloser's request at any time, Recipient shall promptly return to Discloser all originals and copies of any Proprietary Information and destroy all information, records and materials developed therefrom.

Ex. A, ¶ 5.  No termination notice was issued, and thus the First NDA was effective for its full three-year term (that is, at least through May 2, 2016).

20.     No Proprietary Information has been returned to Opternative, and Warby Parker has not destroyed all information, records and materials developed therefrom.

21.     Business association discussions between Opternative and Warby Parker continued into 2014, and on October 6, 2014, the second of the three non-disclosure agreements ("the Second NDA") entered into by Opternative and Warby Parker was fully executed, having an effective date of September 3, 2014. Ex. B, *1.  It should be noted that the Second NDA provides overlapping protection with the First NDA, as the parties never terminated the First NDA.  However, even if the Second NDA were deemed to replace the First NDA, Opternative's claims (set forth below) remain the same.

22.     The Second NDA governs disclosure of "Confidential Information" between Opternative and Warby Parker, and expresses the purpose for disclosure as follows:

6

1.    <u>Purpose for Disclosure.</u>   The parties have discussed and will be discussing a business opportunity of mutual interest (the "**Transaction**"), and in their discussions, may have discussed and may disclose to the other party "Confidential Information" (as defined below).  All Confidential Information furnished pursuant to this Agreement is done so *solely* for the purpose of evaluation of each party's current potential interest in the Transaction *and not to affect, in any way, each party's relative competitive position to each party or to other entities*.

Ex. B, ¶ 1 (bold-italic emphases added).

23.    The Second NDA prohibits use of the Confidential Information for purposes other than evaluation of the Transaction, providing:

3.    <u>Nondisclosure and Nonuse Obligation.</u>   The Recipient (i) shall use the Confidential Information provided by the Discloser *exclusively for the purpose of evaluating the Transaction*; and (ii) agrees that such Recipient will not use, disseminate, or in any way disclose any Confidential Information of the Discloser, except to such employees of Recipient that have a need to know such information *for the purpose of evaluating the Transaction* and are legally bound by terms and conditions no less protective to the Discloser than the terms and conditions applicable to Recipient under this Agreement; (iii) *shall not  reverse engineer, decompile, or disassemble any prototypes, software,* or other tangible or intangible objects which embody Discloser's Confidential Information, and (iv) shall not attempt to derive the composition or underlying information, structure or idea of any Confidential Information.

Ex. B, ¶ 3 (emphases added).

24.    Under the Second NDA, Opternative continued to disclose confidential Proprietary Information, including numerous additional demonstrations of the latest builds of its still in-development online refraction system and an explanation as to how the system operated to determine corrective lenses prescriptions.  Indeed, Warby Parker was permitted to use the in-development system.

25.    Against a backdrop of discussions regarding the potential for a partnership and/or an acquisition of Opternative by Warby Parker, Opternative, between April 14, 2015 and June 24, 2015, disclosed to Warby Parker's leadership highly confidential and/or trade secret documents and information, including (i) a memorandum prepared by Opternative's outside counsel detailing

the proprietary corporate structure by which Opternative effects compliance with its complex legal, regulatory, and ethical obligations and the reasoning and justifications therefore, (ii) a comprehensive report detailing the results of Opternative's clinical trials, and (iii) details regarding Opternative's operating expenses (at the specific request of Warby Parker's leadership).

26.    The Second NDA further provides that ownership over Opternative's Confidential Information and any Derivatives thereof (regardless of which party created or developed the Derivative) remains in Opternative, providing:

> Ownership and Return of Confidential Information and Other Materials.   All Confidential information of each of the parties, as Discloser, and any Derivatives (as defined below) thereof *whether created by such Discloser or the other party,* as Recipient, shall remain the property of Discloser, and no license or other rights to such Discloser's Confidential information or Derivatives is granted or implied hereby.   For purposes of this Agreement, **"Derivatives"** shall mean: (a) for copyrightable or copyrighted material, any translation, abridgment, revision or other form in which an existing work may be recast, transformed or adapted; (b) for patentable or patented material, any improvement thereon; and (c) for material which is protected by trade secret, any new material derived from such existing trade secret material, including new material which may be protected under copyright, patent, and/or trade secret laws.   All materials (including documents, drawings, models, apparatus, sketches, designs, lists and all other tangible media of expression) furnished by each of the parties, as Discloser, to the other party, as Recipient, shall remain the property of such Discloser.   At such Discloser's request and no later than five (5) days after such request, such Recipient shall promptly destroy *or deliver to such Discloser*, at such Discloser's option, (x) all materials furnished to such Recipient by such Discloser *and any Derivatives thereof*, (y) *all tangible media of expression in such Recipient's possession or control* to the extent that such tangible media *incorporate any of such Discloser's Confidential Information and any Derivatives thereof* and (z) written certification of such Recipient's compliance with such Recipient's obligations under this sentence.

Ex. B, ¶ 5 (bold-italic emphases added).

27.    Opternative's system that was disclosed in confidence to Warby Parker is protected by at least U.S. Patent Nos. 9,237,842, 9,492,074, and 9,504,378, and embodies trade secret information.  Warby Parker has introduced its own Prescription Check system that is derived from Opternative's system and is an improvement thereon within the meaning of the Second NDA.

Opternative has demanded delivery of all Confidential Information and Derivatives thereof pursuant to Warby Parker's breach of the Second NDA.

28.     No Confidential Information or Derivatives have been delivered to Opternative, and Warby Parker has not provided any certification that it has destroyed all Confidential Information and Derivatives thereof.

29.     On May 2, 2015, shortly following Warby Parker's solicitation (and receipt) of information regarding Opternative's operating expenses, Opternative sought confirmation from Warby Parker that Warby Parker was only considering, and thus comparing Opternative's technology against, other third-party vendors, and was not seeking to develop its own competing online eye exam system.

30.     Opternative's concerns were based on news coverage, including an April 30, 2015 Wall Street Journal article featuring Warby Parker co-founder and co-chief executive officer Dave Gilboa, which indicated that Warby Parker was "investing in technology to let customers conduct eye exams using just their mobile phones."

31.     In the conversation pursuant to Opternative's May 2, 2015 correspondence, Dave Gilboa reiterated that Warby Parker was "excited to move forward with further testing of [Opternative's] latest exam" and indicated that he was "sensing a bunch of concern that I think is misplaced," suggesting a teleconference to "make sure any concerns are addressed."

32.     Warby Parker assured Opternative that it was not developing its own system.

33.     Despite Opternative's extensive disclosures, Warby Parker, from the spring to the fall of 2015, further insisted upon Opternative granting to Warby Parker control of a testing environment operating Opternative's technology to conduct their own independent comparative study of Opternative's refraction systems.

34.     Warby Parker further insisted upon being granted access to the raw output of Optenative's refraction software.

35.     Optenative never ordinarily made or makes such raw outputs available to competitors or the public both due to (1) the refraction system's incorporation, by design, of an ophthalmologist to analyze and adjust the results outputted by the software, and (2) the need to protect Optenative's confidential and trade secret algorithm against reverse-engineering.

36.     In order to enable its provision of raw data to Warby Parker, Optenative insisted upon an additional data use agreement to protect Optenative's trade secrets and raw data.

37.     However, following substantial resistance from Warby Parker (including Warby Parker's expression that it "hoped to be able to get data and feedback on [Optenative's] exam through [Warby Parker's] IRB [Independent Review Board] and still think we can do some private testing without the lawyers getting in the way"), Optenative agreed to provide access to a testing environment, including provision of access to Optenative software's raw data output, under the protection of an expanded version of the Second NDA.

38.     This third non-disclosure agreement between Optenative and Warby Parker ("the Third NDA"), effective October 22, 2015, comprises terms substantially identical to those of the Second NDA, but further expressly incorporates a category of information entitled "Data Output" into the definition of Confidential Information.  The Third NDA defines "Data Output as follows:

> "**Data Output**" as used in this Agreement shall mean only the following data outputs that are generated by an Optenative exam and that are provided by Optenative to Warby Parker in the course of an internal patient study: the sphere, cylinder and axis data points for each patient that participates in such study.  ***Data Output may only be used for the specific purpose of testing and evaluating the Optenative technology***.  Each party agrees to provide the other with only the following data collected as part of an evaluation of Data output ("Evaluation Data"): a test subject's prior prescription, a test subject's prescription generated from Data Output, and a test subject's satisfaction rating of the prescription generated from Data output.  Both parties agree that any results or conclusions

drawn from evaluation of Data Output may only be shared with third parties (other than consultants) or the public if both parties agree in writing to specific terms and conditions of release."

Ex. C, ¶ 2.

39.     In December of 2015, Opternative provided Warby Parker access to a testing environment, and further provided Warby Parker with access to the raw results of Opternative's eye exam software, consistent with Warby Parker's demands.

40.     Warby Parker conducted over 60 tests using this testing environment.

41.     Warby Parker used data gleaned from Warby Parker's use of this testing environment to assess the viability of the market and further the development of Warby Parker's competing online eye exam system.

42.     Despite assurances to the contrary, Warby Parker had already developed an intent to develop its own online eye exam system even as it negotiated for unfettered access to the inner workings of Opternative's system.

43.     Indeed, On June 5, 2015, less than a month after Mr. Gilboa assured Opternative that its concerns regarding potential direct competition were "misplaced," Warby Parker filed an application for a patent, U.S. Patent Application Serial No. 14/732,435, pertaining to technology directed towards online eye examination systems, specifically: a method of using a mobile camera, such as a smartphone camera, paired with a computer screen, for determining a user's distance from the screen and guiding the user to a particular distance so the user may take an eye exam displayed using the computer screen.

44.     That application for patent matured into U.S. Patent No. 9,532,709 ("the '709 Patent") (attached hereto as Exhibit D).

45.     Warby Parker further falsely ascribed the inventorship of the '709 Patent to Warby Parker employees, even though it was conceived by Dr. Steven Lee of Opternative and related to

Warby Parker employees during a teleconference regarding the user-experience aspects of Opternative's eye exam system.

46.     Notably, one of Warby Parker's alleged inventors of the '709 Patent, Molly Rhodes, Warby Parker's Director of Strategy and Corporate Development, was Opternative's primary point-of-contact at Warby Parker through the course of Opternative's partnership and acquisition negotiations, and was present for conversations where Dr. Lee related the claimed invention of the '709 Patent to Warby Parker.

47.     In addition, Warby Parker's inquiry into the subject matter of the '709 Patent was motivated by Warby Parker's impressions drawn from exposure to Opternative's in-development user interface.

48.     Specifically, following Warby Parker's testing of confidential and in-development builds of Opternative's refraction system and its user interface, Warby Parker questioned Opternative's mechanism of determining the user's distance from the screen (i.e. by instructing the user to move a number of heel-to-toe steps towards or away from the screen for different stages of the refraction).

49.     In response to Warby Parker's inquiries regarding this aspect of Opternative's user interface, Opternative suggested a number of viable alternative methods of determining the user's distance from the screen.

50.     These suggested alternative methods included the use of a camera to determine the user's distance from the screen and guide the user into the desired position, which is the very invention and technology that Warby Parker eventually claimed as their own.

51.     Warby Parker's pursuit of the '709 Patent constitutes a direct result of Warby Parker's exposure to and analysis of Opternative's Confidential/Proprietary Information.

52.     Warby Parker filed the application that eventually matured into the '709 Patent before Opternative's online refraction system was even publicly released, and less than a month after Warby Parker "addressed" Opternative's "misplaced concerns" that Warby Parker may be developing a competing system.

53.     Thus, in addition to constituting an invention of an Opternative employee's conception, because the '709 Patent purports to be an improvement to Opternative's patented system and is derived from Opternative's Confidential Information provided by Opternative to Warby Parker under the protection of the Second NDA and Third NDA, the '709 Patent constitutes a Derivative rightfully owned by Opternative.

54.     Warby Parker's appropriation of the invention of the '709 Patent and its refusal to assign the '709 Patent to Opternative thus further constitutes breach of the Second NDA and Third NDA.

55.     Over the course of their partnership and acquisition discussions, Opternative and Warby Parker exchanged hundreds of e-mails and other correspondence, a sizable majority of which pertained or related to the provision of Opternative's Proprietary or Confidential Information to Warby Parker.

56.     On May 23, 2017, Warby Parker launched a system and service marketed and offered under the name "Prescription Check" which operates in direct competition with Opternative's online refraction system and service.

57.     Warby Parker's Prescription Check system bears substantial similarities to Opternative's online refraction system.

58.     Warby Parker used and benefited from the Proprietary Information and Confidential Information provided by Opternative to inform its decision to enter the online

refraction market and compete with Opternative in contravention of the terms of the Non-Disclosure Agreements.

59.     Warby Parker used and benefited from the Proprietary Information and Confidential Information provided by Opternative in the design and development of Warby Parker's Prescription Check system in contravention of the terms of the Non-Disclosure Agreements.

60.     Warby Parker's Prescription Check system constitutes a Derivative of Opternative's patented and disclosed Confidential Information pursuant to the Second NDA and Third NDA.

61.     Warby Parker used the Proprietary Information and Confidential Information to affect its competitive position versus Opternative in contravention of the terms of the non-Disclosure Agreements.

62.     Warby Parker used and benefited from the Proprietary Information and Confidential Information provided by Opternative in its development of its intellectual property portfolio in contravention of the Non-Disclosure Agreements.

63.     Such intellectual property constitutes a Derivative of Opternative's Proprietary and Confidential Information pursuant to the Second NDA and Third NDA.

64.     Warby Parker used and is using the Proprietary Information and/or Confidential Information (as defined by the Non-Disclosure Agreements) provided to it by Opternative in breach of the prohibitions of ¶ 2 of the First NDA and ¶ 3 of each of the Second NDA and the Third NDA, including by using the Confidential/Proprietary Information in Warby Parker's strategic decisions (including Warby Parker's decision to enter and compete with Opternative in the market for online eye examinations), in the decision to pursue, design, development, and

marketing of the Prescription Check, in Warby Parker's business strategy implemented in connection therewith, in the design and development of the Prescription Check, and in the development and acquisition of Warby Parker's patents.

65.     Warby Parker used and is using Proprietary Information and/or Confidential Information (as defined by the Non-Disclosure Agreements) provided to it by Opternative for purposes that adversely affected Opternative's competitive position vis-à-vis Warby Parker and/or other participants in the online eye exam market in direct breach of ¶ 1 of each of the Second NDA and the and Third NDA.

66.     Warby Parker intentionally misled Opternative as to Warby Parker's intentions in order to procure Opternative's Proprietary Information and Confidential Information.

67.     Warby Parker's breach of the Non-Disclosure Agreements was willful and deliberated.

68.     Warby Parker misappropriated Opternative's trade secret information, the provision of which was subject to the terms of the Non-Disclosure Agreements, by using that information for an unauthorized purpose under and in breach of the Non-Disclosure Agreements.

69.     Warby Parker was and continues to be unjustly enriched by its willful and deliberate breach of the Non-Disclosure Agreements, misappropriation of Opternative's trade secrets, and false allegation of inventorship in the '709 Patent.

70.     Warby Parker willfully and deliberately submitted a false allegation of inventorship during the prosecution of the '709 Patent.

## COUNT I: BREACH OF CONTRACT

71.     Opternative re-alleges and incorporates by reference each of the preceding paragraphs.

72.     As alleged above, Opternative and Warby Parker entered into three valid and enforceable contracts: namely, the Non-Disclosure Agreements.

73.     Opternative rendered adequate performance of the Non-Disclosure Agreements, and, as alleged above, provided Warby Parker with substantial confidential and trade secret documents and information subject to the protection of the Non-Disclosure Agreements.

74.     Warby Parker materially breached ¶ 2 of the First NDA and ¶¶ 1 and 3 of each of the Second NDA and Third NDA.

75.     Warby Parker has used Opternative's Confidential Information in violation of the NDAs by using the Confidential/Proprietary Information in Warby Parker's strategic decisions (including Warby Parker's decision to enter and compete with Opternative in the market for online eye examinations), in the decision to pursue, design, development, and marketing of the Prescription Check, in Warby Parker's business strategy implemented in connection therewith, in the design and development of the Prescription Check, and in the development and acquisition of Warby Parker's patents.  Warby Parker also developed (for non-permissible purposes under the Non-Disclosure Agreements), possesses, has used, and has disclosed to third parties Derivatives of Opternative's Confidential Information within the meaning of ¶ 5 of the Second NDA and Third NDA.  Warby Parker did not disclose its intent to create these Derivatives to Opternative, or disclose their existence to Opternative (except to the extent they were disclosed to third parties as well or the public at large as well).  Warby Parker has further failed to maintain as confidential from third parties, disclose to Opternative, and turn over to Opternative these Derivatives, which, pursuant to ¶ 5 of the Second NDA and Third NDA, are owned by Opternative.

76.     Warby Parker's breaches of the Non-Disclosure Agreements were willful and deliberated.

77.     As a result of Warby Parker's breaches of the Non-Disclosure Agreements, Opternative has suffered damages, including irreparable damages.

## COUNT II: MISAPPROPRIATION OF TRADE SECRETS
## UNDER NEW YORK COMMON LAW

78.     Opternative re-alleges and incorporates by reference each of the preceding paragraphs.

79.     Pursuant to Opternative's business association discussions and negotiations with Warby Parker, Opternative disclosed highly confidential trade secret information to Warby Parker subject to the restrictions and protections of the Non-Disclosure Agreements, and for the exclusive purpose of evaluating the potential transaction.

80.     The trade secret information disclosed to Warby Parker was and is used by Opternative in its business, and gives Opternative an opportunity to obtain an advantage over competitors who do not know or use it.   These trade secrets included, without limitation, documents and information pertaining to Opternative's proprietary business organizational structure, the methodology and results of clinical testing studies of Opternative's eye exam system, and access to the raw outputs of the highly confidential and proprietary algorithm at the heart of Opternative's groundbreaking eye exam system (and which could be used to determine the concepts behind or reverse-engineer Opternative's algorithm).

81.     But for Opternative's disclosure, under protection of non-disclosure agreement, to select partners and Warby Parker, this information is not known outside of Opternative's business. Opternative has taken all reasonable measures to guard the secrecy of the information, as evidenced, e.g., by Opternative's (ultimately justified) resistance to providing Warby Parker access to the raw outputs of its software algorithm without additional and express contractual protections. This confidential information is of immense value to Opternative's business, is the result of

substantial investment of money and effort by Opternative, and forms the foundation for Opternative's competitive edge in the online eye exam market (which Opternative's early investment and pioneering developments played a substantial role in creating). As demonstrated by Opternative's continued position of technology leadership and uniquely capable product offering, the trade secret information enabling Opternative's performance is extremely difficult to independently or properly acquire or duplicate.

82.     Warby Parker misappropriated Opternative's trade secrets in contravention of New York common law by willfully and deliberately procuring Opternative's trade secrets under false pretenses, and then making unauthorized use and disclosure of the information in breach of the confidence placed in Warby Parker by Opternative, for Warby Parker's own advantage, and to the substantial detriment of Opternative.

83.     Opternative has been damaged, substantially and irreparably, through Warby Parker's misappropriation of its trade secrets.

## COUNT III: MISAPPROPRIATION OF TRADE SECRETS UNDER THE FEDERAL DEFEND TRADE SECRETS ACT

84.     Opternative re-alleges and incorporates by reference each of the preceding paragraphs.

85.     As stated above, pursuant to Opternative's business association discussions and negotiations with Warby Parker, Opternative disclosed highly confidential trade secret information to Warby Parker subject to the restrictions and protections of the Non-Disclosure Agreements, and for the exclusive purpose of evaluating the potential transaction.

86.     For the reasons stated in Count II, *supra*, the information disclosed by Opternative to Warby Parker under the protection of the Non-Disclosure Agreements constituted trade secrets that Opternative had taken reasonable measures to keep secret, and that further derives independent

actual and potential economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

87.     Warby Parker misappropriated Opternative's trade secrets in contravention of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b), by willfully and deliberately procuring Opternative's trade secrets under false pretenses and under circumstances giving rise to a duty to limit the use and maintain the secrecy of the trade secret, and then making unauthorized use and disclosure of the information in breach of Warby Parker's contractual duties under the Non-Disclosure Agreements, to Warby Parker's own advantage, and to the substantial detriment of Opternative.

88.     Opternative has been damaged, substantially and irreparably, through Warby Parker's misappropriation of its trade secrets.

## COUNT IV: UNFAIR COMPETITION

89.     Opternative re-alleges and incorporates by reference each of the preceding paragraphs.

90.     As alleged above, Warby Parker misappropriated information for which Opternative had a pecuniary interest, and did so in bad faith through their willful and deliberate breach of the non-disclosure agreements and false representations.

91.     Further, as alleged above, the information misappropriated by Warby Parker provided Opternative with an exclusive commercial advantage.

92.     Opternative has been harmed, and Warby Parker unjustly enriched, by Warby Parker's misappropriation of the labor, skills, and expenditures the information embodies.

## COUNT V: UNJUST ENRICHMENT

93.     Opternative re-alleges and incorporates by reference each of the preceding paragraphs.

94.     In the alternative, should no valid and enforceable contract exist between the parties, Warby Parker has been unjustly enriched by its procurement of Opternative's confidential and trade secret information under false pretenses and with intent to use that information to Opternative's detriment and to negatively affect Opternative's competitive position in the markets for online eye exams and online eye exam systems.

95.     Warby Parker has substantially benefitted from procurement of and exposure to Opternative's confidential information and trade secrets, and that this benefit has been procured at Opternative's expense.  Equity and good conscience require restitution.

## COUNT VI: CORRECTION OF INVENTORSHIP

96.     Opternative re-alleges and incorporates by reference each of the preceding paragraphs.

97.     Consistent with the preceding allegations, the '709 Patent identifies only two inventors: Joseph Carrafa (an engineering manager for Applied Research at Warby Parker) and Molly Rhodes (Director of Strategy and Corporate Development at Warby Parker). Ex. G, *1.

98.     As alleged above, the invention of the '709 Patent was conceived of by Dr. Steven Lee, Chief Science Officer at Opternative, over the course of Opternative and Warby Parker's partnership and acquisition negotiations and related to Warby Parker employees, including Molly Rhodes, on a teleconference.

99.     Warby Parker subsequently, and without informing Opternative or Dr. Lee, filed the application for patent that eventually matured into the '709 Patent, and in doing so, falsely identified

only Carrafa and Rhodes as the inventors of the invention of the '709 Patent.  Thus, the '709 Patent incorrectly identifies (Carrafa and Rhodes) as inventors, and further fails to name Dr. Lee as an inventor even though it was Dr. Lee who conceived of the invention of the '709 Patent.  Inventorship of the '709 Patent should be corrected pursuant to 35 U.S.C. § 256 to include Dr. Lee as the sole inventor, or, in the alternative, at the very least name Dr. Lee as a joint inventor of the '709 Patent.

## COUNT VII: SPECIFIC PERFORMANCE

100.    Opternative re-alleges and incorporates by reference each of the preceding paragraphs.

101.    As established above, each of the Non-Disclosure Agreements constitutes a valid and enforceable contract between Opternative and Warby Parker.

102.    Opternative rendered adequate performance of the Non-Disclosure Agreements, and, as alleged above, provided Warby Parker with substantial confidential and trade secret documents and information subject to the protection of the Non-Disclosure Agreements. Opternative has no further obligations to perform pursuant to the Non-Disclosure Agreements.

103.    Warby Parker materially breached ¶ 2 of the First NDA and ¶¶ 1 and 3 of each of the Second NDA and Third NDA.

104.    Warby Parker possesses and developed Derivatives of Opternative's Confidential Information within the meaning of ¶ 5 of the Second NDA and Third NDA (for purposes that are non-permissible under the Non-Disclosure Agreements), and has further refused to deliver and assign to Opternative these Derivatives, which, pursuant to ¶ 5 of the Second NDA and Third NDA, are owned by Opternative.

105.    Opternative has no adequate remedy at law.  Indeed, the Warby Parker stipulated and agreed in the First NDA and Second NDA that a breach would result in irreparable damages to

Opternative.  Ex. A, ¶ 6; Ex. B, ¶ 14.

106.    Furthermore, per Warby Parker's stipulation and agreement in the Second NDA,

Opternative is entitled to a decree of specific performance.  Ex. B, ¶ 14.

## DAMAGES AND RELIEF

107.    As a consequence of Warby Parker's breach of each of the Non-Disclosure

Agreements entered into between the Opternative and Warby Parker during partnership and/or

acquisition discussions, Opternative has been damaged in an amount not yet determined including,

consistent with the parties' stipulation and agreement in the First NDA and Second NDA,

irreparable damage, and will continue to suffer damages and irreparable damages unless Warby

Parker's breach of the Non-Disclosure Agreements, misappropriation of trade secrets, and

unauthorized use and disclosure of the Proprietary/Confidential Information is enjoined by this

Court, and Warby Parker is ordered to perform its obligations pursuant to the terms of the Non-

Disclosure Agreements.

## PRAYER FOR RELIEF

WHEREFORE, Opternative respectfully requests that the Court enter judgment against

Warby Parker:

A.    Determining that Warby Parker has breached and continues to breach each

of the Non-Disclosure Agreements;

B.    Ordering Warby Parker to account for and pay to Opternative all damages

suffered by Opternative as a consequence of Warby Parker's breach of the Non-Disclosure

Agreements, together with all pre-judgment and post-judgment interests and costs as fixed

by the Court;

C.    Permanently enjoining Warby Parker, its respective officers, agents,

servants, directors, employees, and attorneys, and all persons acting in concert or participation with it, directly or indirectly, or any of them who receive actual notice of the judgment, from further breaching the Non-Disclosure Agreements;

       D.      Ordering that Warby Parker, within no more than five (5) days, transfer to Opternative all right, title, interest, and control in all Derivatives, as defined by the Second and Third Agreements;

       E.      Determining that Warby Parker has misappropriated Opternative's trade secrets in violation of New York common law;

       F.      Ordering Warby Parker to account for and pay to Opternative all damages suffered by Opternative as a consequence of Warby Parker's misappropriation of Opternative's trade secrets under New York common law, together with all pre-judgment and post-judgment interests and costs as fixed by the Court;

       G.      Determining that Warby Parker has misappropriated Opternative's trade secrets in violation the federal Defend Trade Secrets Act;

       H.      Ordering Warby Parker to account for and pay to Opternative all damages suffered by Opternative as a consequence of Warby Parker's misappropriation of Opternative's trade secrets under the federal Defend Trade Secrets Act, together with all pre-judgment and post-judgment interests and costs as fixed by the Court;

       I.      Ordering that Warby Parker return to Opternative all information and documents comprising, pertaining to, or derived from Opternative's trade secret information, and following confirmation by Opternative of receipt and acceptance of all such information and documents, destroy all copies of such information and documents within Warby Parker's possession or control comprising, pertaining to, or derived from

Opternative's trade secret information;

J.      Determining that Warby Parker has, through its misappropriation of Opternative's proprietary information, engaged in unfair competition;

K.      Ordering Warby Parker to account for and pay to Opternative all damages suffered by Opternative as a consequence of Warby Parker's acts of unfair competition, together with all pre-judgment and post-judgment interests and costs as fixed by the Court;

L.      In the alternative, determining that Warby Parker has been unjustly enriched by its unlawful conduct and ordering Warby Parker to account for and make restitution to Opternative, as equity requires, for all damages suffered by Opternative as a consequence of Warby Parker's inequitable availment of benefits at Opternative's expense and/or misappropriation of Opternative's trade secrets;

M.      Ordering Warby Parker to correct the inventorship of the '709 Patent to identify Dr. Steven Lee as the sole inventor, of the invention of the '709 Patent;

N.      Ordering specific performance against Warby Parker as to its obligations under the Non-Disclosure Agreements, including but not limited to the delivery of all Confidential Information and Derivatives to Opternative, including but not limited to assignment of all right, title, and interest in the '709 Patent and its progeny to Opternative;

O.      Granting Opternative such other and further relief as the Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

In accordance with Federal Rule of Civil Procedure 38(b), Opternative demands a trial by jury on all issues so triable.

Dated:  September 12, 2017                    Respectfully submitted,

Iftekhar A. Zaim (*pro hac vice* pending)
**Irwin IP LLC**
1333 Burr Ridge Parkway, Suite 200
Burr Ridge, IL 60527
Phone: 630.756.3104
Facsimile: 630.756.3001
izaim@irwinip.com

*Attorney for Plaintiff Opternative, Inc.*

25