UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------ X

OPTERNATIVE, INC.,                    :
                                      :
                Plaintiff,            :
                                      :
      -against-                       :       No. 17 Civ. 6936 (JFK)
                                      :       **OPINION & ORDER**
JAND, INC. d/b/a WARBY PARKER,        :
                                      :
                Defendant.            :
------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/07/2018____

APPEARANCES

FOR PLAINTIFF OPTERNATIVE, INC.:
      Barry F. Irwin, Esq.
      Iftekhar A. Zaim, Esq.
      IRWIN IP LLC

FOR DEFENDANT JAND, INC. d/b/a WARBY PARKER:
      Philip A. Irwin, Esq.
      Gillian A. Kassner, Esq.
      Richard L. Rainey, Esq.
      Peter A. Swanson, Esq.
      COVINGTON & BURLING LLP

**JOHN F. KEENAN, United States District Judge:**

Before the Court is a motion by Defendant JAND, Inc. d/b/a Warby Parker ("Warby Parker") to dismiss Plaintiff Opternative, Inc.'s ("Opternative") complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Warby Parker's motion is denied in part and granted in part.

## I.   Background

Unless otherwise noted, the following facts and allegations are drawn from the complaint, which, for the purposes of this

1

motion, are presumed to be true.  Opternative is a healthcare technology startup focused on developing innovative technology for the provision of accurate, convenient, and affordable corrective lens prescriptions based on eye exams, or "refractions," conducted via the internet. (Compl. ¶ 8.) Opternative developed a "first-of-its-kind" system whereby ophthalmologists generate a corrective lens prescription using refraction technology:  an online eye-exam a patient can self-administer from any location without the use of specialized equipment. (Id. ¶ 9.)  Opternative launched its online refraction system to the public in July of 2015. (Id. ¶ 11.) Opternative's system is protected by U.S. Patent Nos. 9,237,842, 9,492,074, and 9,504,378. (Id. ¶ 27.)

In 2013, Opternative met with Warby Parker to discuss Opternative's then in-development online refraction system and the potential for partnership. (Id. ¶ 15.)  The parties entered into three non-disclosure agreements to enable these discussions. (Id.)  The first non-disclosure agreement (the "First NDA"), effective May 2, 2013, provides that Warby Parker, as the recipient of "Proprietary Information," can use such information "only for its consideration internally of a potential business relationship or transaction between the parties . . . but not for any other purpose." (Id.) "Proprietary Information" is defined as

> all financial, business, legal and technical
> information of Discloser . . . (including
> information about research, development,
> operations, marketing, transactions,
> regulatory affairs, discoveries, inventions,
> methods, processes, articles, materials,
> algorithms, software, specifications,
> designs, drawings, data, strategies, plans,
> prospects, know-how and ideas, whether
> tangible or intangible, and including all
> copies, abstracts, summaries, analyses and
> other derivatives thereof), that is marked
> or otherwise identified as proprietary or
> confidential at the time of disclosure, or
> that by its nature would be understood by a
> reasonable person to be proprietary or
> confidential.  Proprietary Information shall
> not include any information that (a) was
> rightfully known to Recipient without
> restriction before receipt from Discloser,
> (b) is rightfully disclosed to Recipient
> without restriction by a third party, (c) is
> or becomes generally known to the public
> without violation of this Agreement by
> Recipient or (d) is independently developed
> by Recipient or its employees without access
> to or reliance on such information.

(Compl. Ex. A at 1.)

Additionally, Warby Parker promised that it would not

"disclose the Proprietary Information to any third party" or

"decompile, disassemble or otherwise reverse engineer any

Proprietary Information, or use any similar means to discover

its underlying composition, structure, source code or trade

secrets." (Id.)  Under the "Remedies" clause of the First NDA,

"the parties agree that any breach or threatened breach of this

Agreement will cause not only financial harm to Discloser, but

also irreparable harm for which money damages will not be an

adequate remedy." (Id.)  The "Termination" clause provides that
the confidentiality obligations of the agreement survive
termination for five years, and that, upon termination or upon
Opternative's request, Warby Parker was required to return all
originals and copies of any Proprietary Information, and to
destroy all information, records, and materials developed from
that information. (Id. ¶ 19.)  Because no termination notice was
issued, the First NDA was effective through May 2, 2016. (Id.)

     Under the protection of the First NDA, Opternative provided
Warby Parker with confidential Proprietary Information,
including numerous demonstrations of the latest builds of its
in-development online refraction system and an explanation as to
how the system determined corrective lens prescriptions. (Id. ¶¶
16-17.)  On September 2, 2014, Opternative provided Warby Parker
with confidential correspondence between Opternative and the FDA
regarding the likely FDA classification of Opternative's online
refraction system. (Id. ¶ 18.)  Opternative alleges that no
Proprietary Information has been returned, and Warby Parker has
not destroyed all information, records, and materials developed
from that information. (Id. ¶ 20.)

     Discussions between Opternative and Warby Parker continued,
and on October 6, 2014, the parties entered into the second non-
disclosure agreement (the "Second NDA"), with an effective date
of September 3, 2014. (Id. ¶ 21.)  The Second NDA provides that

all "Confidential Information" will be furnished solely for the purpose of evaluation of each party's potential interest for a partnership or an acquisition of Opternative by Warby Parker (the "Transaction"), and will not "affect, in any way, each party's relative competitive position to each party or to other entities." (Id. ¶¶ 22, 25.) "Confidential Information" is defined as

> any and all confidential and/or proprietary knowledge, data or information of each of the parties in tangible or intangible form whether or not in writing and whether or not labeled or identified as confidential or proprietary, including, patents, copyrights, trade secrets, techniques, sketches, drawings, models, inventions, products, know-how, processes, apparatus, equipment, algorithms, technology, software programs, software source documents, formulae, research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, operations, purchasing, manufacturing, customer lists, business forecasts, sales and merchandising, marketing plans and information, and the existence and content of discussions between the parties.

(Compl. Ex. B at 1.)

The Second NDA prohibits use of the Confidential Information for purposes other than evaluating the Transaction, and provides that Warby Parker is barred from "reverse engineer[ing], decompil[ing], or disassembl[ing] any prototypes, software, or other tangible or intangible objects" which embody

Opternative's Confidential Information, and from attempting to

"derive the composition or underlying information, structure or

idea of any Confidential Information." (Id. ¶ 23.)

Additionally, the Second NDA provides that ownership over

Opternative's Confidential Information, and any "Derivatives" of

said material, "whether created by [Opternative] or [Warby

Parker]," remain property of Opternative. (Id. ¶ 26.)

"Derivatives" are defined as "for copyrighted material, any

translation, abridgement, revision or other form in which an

existing work may be recast, transformed or adapted . . . for

patented material, any improvement thereon; and . . . for

material which is protected by trade secret, any new material

derived from such existing trade secret material, including new

material which may be protected under copyright, patent, and/or

trade secret laws." (Id.)

Under the Second NDA, Opternative continued to disclose

confidential Proprietary Information, including numerous

demonstrations of the latest builds of its still in-development

online refraction system and an explanation as to how the system

determines corrective lenses prescriptions. (Id. ¶ 24.)  Warby

Parker was permitted to use the in-development system. (Id.)  In

addition, between April 14, 2015 and June 24, 2015, Opternative

disclosed to Warby Parker's leadership confidential trade secret

documents and information, including (1) a memorandum by

Opternative's outside counsel detailing the proprietary corporate structure by which Opternative effects compliance with their legal and regulatory obligations, (2) a comprehensive report detailing the results of Opternative's clinical trials, and (3) details regarding Opternative's operating expenses, disclosed at Warby Parker's request. (Id. ¶ 25.)

On May 2, 2015, Opternative sought assurances that Warby Parker was not developing its own competing online eye exam system. (Id. ¶ 29.) Opternative's concerns were based on news articles, including an April 30, 2015 Wall Street Journal article featuring Warby Parker co-founder and co-CEO Dave Gilboa ("Gilboa"), which indicated that Warby Parker was "investing technology to let customers conduct eye exams using just their mobile phones." (Id. ¶ 30.) In response to Opternative's inquiry, Gilboa reiterated that Warby Parker was "excited to move forward with further testing of [Opternative's] latest exam" and indicated that he was "sensing a bunch of concern that I think is misplaced," suggesting a teleconference to "make sure any concerns are addressed." (Id. ¶ 31.)

On June 5, 2015, less than a month after Gilboa's "assurances" to Opternative, Warby Parker filed an application for a patent, U.S. Patent Application Serial No. 14/732,435, pertaining to technology directed towards online eye examination systems, specifically a method of using a mobile camera, such as

a smartphone camera, paired with a computer screen, for determining a user's distance from the screen and guiding the user to a particular distance so the user may take an eye exam displayed using the computer screen. (Id. ¶¶ 42-43.) That patent application matured into U.S. Patent No. 9,532,709 (the "709 Patent"). (Id. ¶ 44.)

Opternative alleges that Warby Parker's pursuit of the 709 Patent arose directly from its exposure to and analysis of Opternative's Confidential and Proprietary information. (Id. ¶ 51.) Opternative alleges that Warby Parker falsely ascribed the inventorship of the 709 Patent to Warby Parker employees, despite the fact that it was conceived by Dr. Steven Lee of Opternative ("Dr. Lee") and relayed to Warby Parker employees during a teleconference "regarding the user-experience aspects of Opternative's eye exam system." (Id. ¶ 45.) In addition, one inventor of the 709 Patent, Molly Rhodes, Warby Parker's Director of Strategy and Corporate Development, served as Opternative's primary point of contact through the course of the partnership, and was present when Dr. Lee relayed the claimed invention of the 709 Patent to Warby Parker. (Id. ¶ 46.)

From the spring to the fall of 2015, Warby Parker requested control of Opternative's testing environment so that Warby Parker could conduct its own independent comparative study of Opternative's online refraction system. (Id. ¶ 33.) Warby

Parker also insisted on being granted access to the raw output of Opternative's refraction software, which Opternative was reluctant to give, in part because of the need to protect its confidential trade secret algorithm against reverse-engineering. (Id. ¶¶ 34-35.) Opternative agreed to provide access to a testing environment, including Opternative software's raw data output, under the protection of an expanded version of the Second NDA (the "Third NDA"). (Id. ¶ 37.)

The Third NDA, effective October 22, 2015, contains terms substantially identical to those of the Second NDA, but expressly incorporates a category of information entitled "Data Output" into the definition of Confidential Information. (Id. ¶ 38.) "Data Output" is defined to include "data outputs that are generated by an Opternative exam and that are provided . . . to Warby Parker in the course of an internal patient study: the sphere, cylinder and axis data points for each patient that participates in such study." (Id.) Data Output may only be used for "the specific purpose of testing and evaluating the Opternative technology," and may only be shared with third parties or the public upon written agreement. (Id.)

In December of 2015, Opternative provided Warby Parker access to a testing environment and to the raw results of Opternative's eye exam software. (Id. ¶ 39.) Warby Parker conducted over sixty tests, and used data gleaned from this

testing environment to assess the viability of the online eye exam market and further develop Warby Parker's competing online refraction system. (<u>Id.</u> ¶¶ 40-41.)  Following Warby Parker's testing of Opternative's system, Warby Parker questioned Opternative's mechanism for determining the user's distance from the screen—i.e., by instructing the user to move a number of heel-to-toe steps towards or away from the screen for different stages of the refraction. (<u>Id.</u> ¶ 48.)  In response, Opternative suggested a number of viable alternative methods of determining the user's distance from the screen, including the use of a camera to determine the user's distance from the screen and guide the user into the desired position—the very invention and technology that Warby Parker "eventually claimed as their own." (<u>Id.</u> ¶¶ 49-50.)  On May 23, 2017, Warby Parker launched a system marketed under the name "Prescription Check" which operates in direct competition with and bears substantial similarities to Opternative's online refraction system. (<u>Id.</u> ¶¶ 56-57.)

Opternative alleges that Warby Parker's appropriation of the invention of the 709 Patent and its refusal to assign the 709 Patent to Opternative, which is a Derivative of Opternative's Confidential Information, constitutes breach of the NDAs. (<u>Id.</u> ¶¶ 53-54.)  Further, Warby Parker used the Proprietary and Confidential Information provided by Opternative "to inform its decision to enter the online refraction market"

and in the design and development of Warby Parker's Prescription Check system, also a Derivative of Confidential Information, in contravention of the NDAs' terms. (Id. ¶¶ 58-59.) Opternative has demanded delivery of all Confidential Information and Derivatives thereof pursuant to Warby Parker's breach, however, no Confidential Information or Derivatives have been delivered to Opternative, and Warby Parker has not provided any certification that it has destroyed all Confidential Information and Derivatives. (Id. ¶¶ 27-28.)

On September 12, 2017, Opternative filed the complaint against Warby Parker, alleging seven claims: (1) breach of contract, (2) misappropriation of trade secrets under New York common law, (3) misappropriation of trade secrets under the Federal Defend Trade Secrets Act ("FDTSA"), 18 U.S.C. § 1836(b), (4) unfair competition, (5) unjust enrichment, (6) correction of inventorship, and (7) specific performance of Warby Parker's obligations under the NDAs. (Id. ¶¶ 71-106.) On November 6, 2017, Warby Parker moved to dismiss the complaint for failure to state claims under Rule 12(b)(6).

## II. Discussion

### A. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff

pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the

misconduct alleged." Matson v. Bd. of Educ., 631 F.3d 57, 63 (2d

Cir. 2011).  In determining the adequacy of the complaint, the

Court may consider any document attached to the complaint as an

exhibit or incorporated in the complaint by reference, as well

as documents which are integral to the complaint. Int'l

Audiotext Network, Inc. v. AT&T Co., 62 F.3d 69, 72 (2d Cir.

1995) (per curiam).  On a motion to dismiss, the Court must

accept the factual allegations in the complaint as true and draw

reasonable inferences in the plaintiff's favor. Tsirelman v.

Daines, 794 F.3d 310, 313 (2d Cir. 2015).  In addition, the

Court "should resolve any contractual ambiguities in favor of

the plaintiff." Subaru Distributors Corp. v. Subaru of Am.,

Inc., 425 F.3d 119, 122 (2d Cir. 2005).

### B.    Analysis

### 1.    Opternative Has Plausibly Alleged Claims for Breach of Contract and Specific Performance

Opternative has plausibly alleged claims for breach of

contract and specific performance against Warby Parker.  Under

New York law, to state a breach of contract claim, the plaintiff

must allege (1) the existence of a contract, (2) performance by

the party seeking recovery, (3) non-performance by the other

12

party, and (4) damages. <u>RCN Telecom Servs., Inc. v. 202 Centre St. Realty, LLC</u>, 156 F. App'x 349, 350-51 (2d Cir. 2005). Specific performance is an equitable remedy for breach of contract. <u>Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Capital Holdings LLC</u>, 289 F. Supp. 3d 484, 495 (S.D.N.Y. 2018). "At the motion to dismiss stage, a plaintiff need only plead allegations from which damages attributable to defendant's [breach] might be reasonably inferred." <u>Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.</u>, No. 14-CV-9687 (VEC), 2016 WL 4916969, at *6 (S.D.N.Y. Feb. 11, 2016) (citations and internal quotation marks omitted).

In the NDAs, Warby Parker agreed to use Opternative's Confidential and Proprietary Information only for the purpose of evaluating a business relationship with Opternative. Pursuant to the First NDA, Warby Parker agreed "to use the Proprietary Information <u>only</u> for its consideration internally of a potential business relationship or transaction between the parties, and its performance in any resulting arrangement, <u>but not for any other purpose</u>." (Compl. ¶ 15; Compl. Ex. A ¶ 2 (emphasis added).) Under the Second NDA, Warby Parker agreed that all "Confidential Information furnished pursuant to this Agreement is done so solely for the purpose of evaluation of each party's current potential interest in the Transaction and not to affect, in any way, each party's relative competitive position to each

13

party or to other entities." (Compl. ¶ 22; Compl. Ex B ¶ 1.)

Under the Third NDA, Warby Parker agreed that Data Output "may only be used for the specific purpose of testing and evaluating the Opternative technology." (Id. ¶ 38; Compl. Ex. C ¶ 2.)

Opternative alleges that, under the protections of the NDAs, it provided Warby Parker with "substantial confidential Proprietary Information," including numerous demonstrations of the latest builds of its in-development online refraction system, an explanation as to how the system operated to determine corrective lenses prescriptions, and access to Opternative's raw data output. (Id. ¶¶ 16-17, 24, 37.) Opternative also disclosed to Warby Parker highly confidential materials including (1) a memorandum by Opternative's outside counsel detailing the proprietary corporate structure by which Opternative effects compliance with its complex legal, regulatory, and ethical obligations, (2) a comprehensive report detailing the results of Opternative's clinical trials, and (3) details of Opternative's operating expenses. (Id. ¶ 25.)

According to the complaint, Warby Parker used Opternative's Confidential Information to inform its decision to enter the online refraction market and compete with Opternative, in breach of the NDAs. (Id. ¶ 58.) On June 5, 2015, Warby Parker filed the 709 Patent application pertaining to technology directed towards online eye examination systems—specifically, a method of

using a mobile camera paired with a computer screen, for determining a user's distance from the screen and guiding the user to a particular distance so the user may take an eye exam displayed using the computer screen. (Id. ¶ 43.) Warby Parker "falsely ascribed the inventorship of the '709 Patent to Warby Parker employees, even though it was conceived by [Dr. Lee]." (Id. ¶ 45.) Notably, a named inventor of the 709 Patent, Molly Rhodes, was present for conversations where Dr. Lee related the claimed invention of the 709 Patent to Warby Parker. (Id. ¶ 46.) Opternative alleges that the 709 Patent is an improvement on Opternative's online refraction system and is a direct result of Warby Parker's exposure to and analysis of Opternative's Confidential Information. (Id. ¶¶ 51, 53.)

In addition, Opternative claims that Warby Parker used data gleaned from Opternative's testing environment to assess the viability of the online refraction market, inform its business strategy for entering the market, and further the development of its competing system. (Id. ¶¶ 41, 64.) Following Warby Parker's testing of Opternative's online refraction system, "Warby Parker questioned Opternative's mechanism of determining the user's distance from the screen" and in response, "Opternative suggested a number of viable alternative methods of determining the user's distance from the screen . . . includ[ing] the use of a camera to determine the user's distance from the screen and

guide the user into the desired position, which is the very

invention and technology that Warby Parker eventually claimed as

their own." (Id. ¶¶ 48-50.)  Opternative alleges that

Prescription Check, Warby Parker's online refraction system, is

derived from, operates in direct competition with, and bears

substantial similarities to Opternative's online refraction

system. (Id. ¶¶ 27, 56-57.)  These allegations are sufficient to

plead a claim for breach of contract against Warby Parker.

     In its motion to dismiss, Warby Parker first argues that

"[w]here the alleged breach involves the misuse of trade secret

or confidential information in violation of an NDA, a plaintiff

may not allege [] mere possession . . . rather, it must plead

facts from which the court can plausibly infer that the

defendant misused that information." (Def.'s Mem. of L. in Supp.

of Mot. to Dismiss at 8, ECF No. 26 (filed Nov. 6, 2017)

[hereinafter Def.'s Mem.].)  Warby Parker contends that at most,

Opternative alleges that Warby Parker had access to

Opternative's Confidential Information, which does not give rise

to an inference that Warby Parker "misused" that information in

violation of the NDAs. (Id. at 9.)  However, "[i]t is well

recognized with respect to trade secrets that . . . misuse can

rarely be proved by convincing direct evidence.  In most cases

plaintiffs must construct . . . circumstantial evidence from

which the trier of fact may draw inferences which convince him

that it is more probable than not that what plaintiffs allege happened did in fact take place." Q-Co Indus., Inc. v. Hoffman, 625 F. Supp. 608, 618 (S.D.N.Y. 1985) (quoting Greenberg v. Croydon Plastics Co. Inc., 378 F. Supp. 806, 814 (E.D. Pa. 1974)).  As discussed above, Opternative alleges that Warby Parker used Opternative's Confidential Information—including demonstrations of its in-development system, internal memoranda and reports, and methods of distance determination using a camera—to inform its decision to enter the online refraction market, in making strategic and marketing decisions, in the invention of the 709 Patent, and in the design and development of Prescription Check.  These allegations are sufficient to establish circumstantial evidence from which the factfinder could infer that Warby Parker used Opternative's Confidential Information for purposes other than evaluating a business relationship with Opternative, in breach of the NDAs.

Second, Warby Parker argues that "independent development" of Prescription Check is an "obvious alternative explanation" for Warby Parker's launch of a competitive system bearing substantial similarities to Opternative's system. (Def.'s Mem. at 9, 11.)  However, that two plausible inferences may be drawn from factual allegations is not a choice to be made by the Court on a Rule 12(b)(6) motion, and in such case, a breach of

contract claim must not be dismissed. Anderson News LLC v.
American Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012).

Third, Warby Parker argues that the idea of using a camera
to determine the user's distance from the screen and guide the
user into the desired position "was already known in the prior
art" as Opternative's Patent No. 9,237,842 (the "842 Patent"),
published nine months before the 709 Patent application,
discusses using a camera attached to a computerized screen to
determine the distance of the patient. (Def.'s Mem. at 12
(citing U.S. Patent No. 9,237,842, Irwin Decl. Ex. 1, ECF No.
27-1 at 35 (filed Nov. 6, 2017) [hereinafter 842 Patent]).)
Because this information was publicly available, Warby Parker
contends that it is not "Confidential Information" under the
NDAs.  The Court is unpersuaded.  First, it is not clear that
the method of using a camera to determine the user's distance
from the screen described in the 842 Patent is the same as the
method described in the complaint.  The complaint alleges that
Opternative suggested using a "camera to determine the user's
distance from the screen and guide the user into the desired
position." (Compl. ¶ 50.)  The 842 Patent describes using "a
camera which may be attached to the computerized screen to
determine the distance of the patient from the computerized
screen." (842 Patent at 35.)  Drawing all reasonable inferences
in Opternative's favor, it is plausible that the method of using

a camera to "guide the user into the desired position" was not
included in the 842 Patent, and thus was not publicly available.

Moreover, even if Opternative's distance-determination
method was made public prior to the 709 Patent application, it
was only one piece of the Confidential Information Opternative
divulged to Warby Parker. Opternative alleges that it
"suggested a number of viable alternative methods of determining
the user's distance from the screen" <u>including</u> using a camera to
"guide the user into the desired position," which was not
included in the 842 Patent. (Compl. ¶¶ 49-50.) Opternative also
alleges that it provided Warby Parker with demonstrations of its
in-development refraction system, internal memoranda and
reports, and raw outputs of the confidential algorithm in
Opternative's system. Thus, Opternative has plausibly alleged
that it disclosed non-public Confidential Information that Warby
Parker used to develop the 709 Patent and Prescription Check in
breach of the NDAs. <u>See, e.g.</u>, <u>Nat'l Elevator Cab & Door Corp.</u>
<u>v. H & B, Inc.</u>, No. 07CV1562 (ERK)(RML), 2008 WL 207843, at *12
& n. 28 (E.D.N.Y. Jan. 24, 2008) (finding likelihood of misuse
of confidential trade secret information where "at least some"
of the proprietary information disclosed to defendant was "not
publicly available" at the time).

Opternative has also sufficiently alleged breach of the
NDAs based on Warby Parker's failure to return, deliver, and

assign to Opternative all Confidential Information and Derivatives therefrom. Under the NDAs, Warby Parker is required to, upon request, destroy or deliver all materials furnished and any Derivatives thereof. (Compl. ¶¶ 19, 26.) Further, "[a]ll Confidential [I]nformation of . . . [Opternative], and any Derivatives . . . shall remain the property of [Opternative]." (Id. ¶ 26.) Opternative alleges that Warby Parker's Prescription Check "constitutes a Derivative of Opternative's Proprietary and Confidential Information pursuant to the Second and Third NDA." (Id. ¶¶ 60, 63.) Opternative also alleges that Warby Parker "developed . . . . possesses, has used, and has disclosed to third parties Derivatives of Opternative's Confidential Information . . . which, pursuant to ¶ 5 of the Second NDA and Third NDA, are owned by Opternative." (Id. ¶ 75.) However, "[n]o Proprietary Information has been returned to Opternative, and Warby Parker has not destroyed all information, records and materials developed therefrom." (Id. ¶ 20.) Thus, Opternative has alleged breach of contract based on Warby Parker's failure to return, assign, or destroy Confidential Information.

Finally, Warby Parker argues that Opternative has failed to allege that it suffered any damages from Warby Parker's failure to deliver, assign, or destroy all Confidential Information. (Def.'s Mem. at 14.) First, Warby Parker stipulated in the

First and Second NDAs that a breach of the NDAs would cause not only financial harm, but also "irreparable harm" to Opternative. (Compl. ¶¶ 15, 105.)  Second, Opternative alleges that Warby Parker's unauthorized use of Opternative's Confidential Information and its failure to assign the 709 Patent to Opternative has resulted in irreparable damages. (Id. ¶¶ 77, 107.)  Thus, Opternative has adequately alleged claims for breach of contract.

## 2. Opternative Has Failed to State a Claim for Unjust Enrichment

Under New York law, the existence of a valid contract typically bars recovery based on the quasi-contract theory of unjust enrichment. Agerbrink v. Model Serv. LLC, 155 F. Supp. 3d 448, 458-59 (S.D.N.Y. 2016).  However, when there is a bona fide dispute as to the existence of a contract, an unjust enrichment claim may be alleged in the alternative alongside a breach of contract claim. Labajo v. Best Buy Stores, L.P., 478 F. Supp. 2d 523, 531 (S.D.N.Y. 2007).  Nevertheless, "a claim for unjust enrichment will not survive a motion to dismiss unless a plaintiff explains how the claim is not simply duplicative of its other claims." AFP Mfg. Corp. v. AFP Imaging Corp., No. 17-CV-03292 (NSR), 2018 WL 3329859, at *11 (S.D.N.Y. July 6, 2018). It follows that "where there is a valid and enforceable contract between the parties, and the subject matter of the unjust enrichment claim is covered by the contract" a court must

dismiss the unjust enrichment claim. ImagePoint, Inc. v.
JPMorgan Chase Bank, Nat. Ass'n, 27 F. Supp. 3d 494, 516
(S.D.N.Y. 2014) (internal quotation marks omitted).

Opternative and Warby Parker agree that the NDAs are valid
contractual agreements. (Compl. ¶¶ 72, 101; Def.'s Mem. at 16.)
Although Opternative pleads its unjust enrichment claim "in the
alternative," the subject matter of its unjust enrichment claim—
Warby Parker's alleged misuse of Opternative's Confidential
Information—is covered by the NDAs. (See Compl. ¶¶ 93-95.)
Accordingly, because Opternative seeks to "simply duplicate" a
conventional contract claim for Warby Parker's breach of the
NDAs, the unjust enrichment claim is dismissed with prejudice.
Marshall v. Hyundai Motor Am., 51 F. Supp. 3d 451, 472 (S.D.N.Y.
2014); see also AFP Mfg. Corp., 2018 WL 3329859, at *11
(dismissing unjust enrichment claim with prejudice where the
only evidence plaintiff offered in support of its claim was a
"restatement of the evidence that it provided in furtherance of
its breach of contract claim").

### 3. Opternative Has Failed to Allege Claims for Misappropriation of Trade Secrets and Unfair Competition Under New York Law

Under New York law, "[w]here the plaintiff and defendant
are parties to a contract, and the plaintiff seeks to hold the
defendant liable in tort, the plaintiff must prove that the
defendant breached a duty 'independent' of its duties under the

contract; otherwise plaintiff is limited to an action in contract." Carvel Corp. v. Noonan, 350 F.3d 6, 16 (2d Cir. 2003). However, a defendant "may also breach an independent duty in tort if the defendant goes beyond a mere breach of the contract and acts in such a way that a trier of fact could infer that it willfully intended to harm the plaintiff." Id.

Opternative has not sufficiently alleged that Warby Parker acted willfully in breaching the NDAs. Opternative argues that "Warby Parker actively misrepresented its intentions" and "used deceit to procure Opternative's Confidential Information in willful and deliberate breach of its obligations under the NDAs." (Pl.'s Mem. in Opp'n to Mot. to Dismiss at 3, 21, ECF No. 36 (filed Nov. 29, 2017) [hereinafter Pl.'s Mem.].) However, the only evidence Opternative provides to support this allegation is a May 2, 2015 email from Gilboa, which states only that Warby Parker was "excited to move forward with further testing of [Opternative's] latest exam" and indicated that Gilboa was "sensing a bunch of concern that I think is misplaced." (Compl. ¶ 31.) Opternative's allegation that "Warby Parker assured Opternative that it was not developing its own system" and thereby used deceit to gain access to Opternative's Confidential Information is not reflected in either of these statements. Thus, Opternative has not alleged that Warby Parker willfully intended to harm Opternative. See, e.g., A Star Grp.,

Inc. v. Manitoba Hydro, No. 13 CIV. 4501 PAC, 2014 WL 2933155, at *7 (S.D.N.Y. June 30, 2014) (dismissing tort claims as duplicative of breach of contract claims where "the Complaint relie[d] exclusively on the confidentiality provisions contained in the contracts" and plaintiff did not show any willfulness on the part of defendant). Accordingly, Opternative's New York law tort claims are duplicative of its breach of contract claims and must be dismissed.

## 4. Opternative Has Failed to Allege a Claim for Misappropriation of Trade Secrets Under the Federal Defend Trade Secrets Act

To allege a claim for misappropriation of trade secrets under FDTSA, the plaintiff must establish "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." Free Country Ltd v. Drennen, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016). The FDTSA's definition of "improper means" includes "misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy," but expressly excludes "reverse engineering" and "independent derivation." Broker Genius, Inc.

v. Zalta, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017) (quoting 18 U.S.C. § 1839(6)(A)-(B)).

Opternative has not alleged that Warby Parker acquired Opternative's trade secrets through improper means.  The only evidence Opternative cites in support of its argument is the May 2015 email from Gilboa, which Opternative contends included false and misleading statements assuring Opternative that Warby parker was not developing its own competing system.  As discussed above, these statements do not demonstrate deceit on the part of Warby Parker and are not sufficient to allege that Warby Parker acquired Opternative's confidential information through improper means. See, e.g., Broker Genius, Inc., 280 F. Supp. 3d at 511 n.5 (plaintiff could not establish that defendants improperly acquired trade secrets in claim for misappropriation under FDTSA where defendants were customers of plaintiff when they first acquired the relevant information).  Thus, Opternative has failed to state a claim for misappropriation of trade secrets under FDTSA.

## 5. Opternative Has Failed to Allege a Claim for Correction of Inventorship

Correction of inventorship is governed by 35 U.S.C. § 256: "[w]henever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may, on application of all the

parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error." 35 U.S.C. § 256(a). "A person who alleges that he is a co-inventor of the invention claimed in an issued patent who was not listed as an inventor on the patent may bring a cause of action to correct inventorship in a district court under 35 U.S.C. § 256." Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1356 n.1 (Fed. Cir. 2004).

Opternative claims that inventorship of the 709 Patent should be corrected pursuant to 35 U.S.C. § 256 to include Dr. Lee as the sole inventor, or, in the alternative, as a joint inventor of the 709 Patent. "[A] claim of sole inventorship necessitates that the proposed inventor conceived of the total patented invention." Ferring B.V. v. Allergan, Inc., 166 F. Supp. 3d 415, 424 (S.D.N.Y. 2016); see also Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick, No 04-9014, 2008 WL 8627085, at *7 (C.D. Cal. June 9, 2008) ("Plaintiffs must show that they conceived of every claim of the patent and that any contribution by [the named inventors] to the conception of each and every claim was insignificant."). As the inventors named on a patent are presumed to be correct, a person seeking to add his name "must meet the heavy burden of proving its case by clear and convincing evidence." Eli Lilly, 376 F.3d at 1358.

Alternatively, to establish joint inventorship, "there must be some element of joint behavior, such as collaboration or working under common direction . . . ." <u>Kimberly-Clark Corp. v. Procter & Gamble Distributing Co., Inc.</u>, 973 F.2d 911, 917 (Fed. Cir. 1992). A joint inventor must "(1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art." <u>Yeda Research & Dev. Co. v. Imclone Sys. Inc.</u>, 443 F. Supp. 2d 570, 617 (S.D.N.Y. 2006). "[T]he test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention." <u>Burroughs Wellcome Co. v. Barr Labs., Inc.</u>, 40 F.3d 1223, 1228 (Fed. Cir. 1994). "To establish joint inventorship by clear and convincing evidence, a party may not rely solely on his own testimony or that of his purported co-inventors, but rather must offer corroborating evidence of conception." <u>Yeda Research & Dev. Co.</u>, 443 F. Supp. 2d at 617.

Opternative alleges that Dr. Lee "conceived of the invention of the '709 Patent," namely, the use of a camera to determine the user's distance from the screen and guide the user

into the desired position, and "related [it] to Warby Parker employees during a teleconference." (Compl. ¶¶ 45-46, 50, 98-99.) Beyond these conclusory and vague statements, the complaint does not include any specific allegations that Dr. Lee conceived of the total patented invention and that any contribution by the named inventors in the 709 Patent was insignificant. Thus, Opternative has failed to state a claim for sole inventorship.

Furthermore, Opternative fails to allege any facts showing that Dr. Lee's purported suggestion to use a camera constituted a "complete and operative invention" as opposed to a "general goal or research plan," or that it was so clearly defined that "only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." Burroughs Wellcome Co., 40 F.3d at 1228. In addition, Opternative has failed to provide sufficient corroborating evidence of Dr. Lee's inventorship. Opternative claims that Dr. Lee relayed the invention of the patent over a teleconference, but fails to provide any further corroborating details or documentation of this teleconference, including the date the teleconference took place or Dr. Lee's specific contribution. See, e.g., Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1295-96 (Fed. Cir. 2008) (affirming district court's holding that day-planner entry confirming telephone call related

to the disputed patent was insufficient as corroborating evidence of co-inventorship because it failed to identify the alleged co-inventor's contribution); Gerawan Farming, Inc. v. Rehrig Pac. Co., No. 1:11-CV-01273 LJO, 2013 WL 1414637, at *9-10 (E.D. Cal. Apr. 8, 2013) (corroborating testimony insufficient where co-inventor could not provide clear date of corroboration and had general lack of knowledge about the invention at issue).  Thus, Opternative has failed to allege either sole or joint inventorship and its claim for correction of inventorship is dismissed.

### III. Leave to Amend

Opternative requests leave to replead any curable deficiencies if all or part of the complaint is dismissed. (Pl.'s Mem. at 25.)  Federal Rule of Civil Procedure 15 instructs a court to "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).  However, amendment "is not warranted absent some indication as to what [a plaintiff] might add to [its] complaint in order to make it viable." Horoshko v. Citibank, N.A., 373 F.3d 248, 249 (2d Cir. 2004) (internal quotation marks omitted).  Accordingly, should Opternative wish to amend, its motion must demonstrate how it will cure the deficiencies in its claims, that justice requires granting leave to amend, and must be filed by September 15, 2018.

**CONCLUSION**

For the reasons stated above, Warby Parker's motion to dismiss the complaint is DENIED in part and GRANTED in part. Warby Parker's motion to dismiss Opternative's claims for breach and contract and specific performance is denied. Warby Parker's motion to dismiss the remainder of Opternative's claims is granted. Opternative's unjust enrichment claim is dismissed with prejudice. Opternative's claims for misappropriation of trade secrets and unfair competition under New York law, misappropriation of trade secrets under FDTSA, and correction of inventorship are dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the motion docketed at ECF No. 25.

**SO ORDERED.**

Dated:   New York, New York
         August 7 , 2018

                                    John F. Keenan
                        John F. Keenan
                 United States District Judge